USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAR 1 1 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                 :
THOMAS TARSAVAGE, individually and on                            :
behalf of all others similarly situated, and on                  :
behalf of Puda Coal, Inc. derivatively,                          :
                                                                 :
                                    Plaintiff,                   :          13 Civ. 2312 (KBF)
                                                                 :
                  -v-                                            :          OPINION & ORDER
                                                                 :
CITIC TRUST CO., LTD.,                                           :
                                                                 :
                                    Defendant,                   :
                                                                 :
                  -and-                                          :
                                                                 :
PUDA COAL, INC.,                                                 :
                                                                 :
                                    Nominal Defendant.           :
                                                                 :
-------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

Before the Court is defendant CITIC Trust Co., Ltd.'s motion to dismiss the complaint in this action pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). For the following reasons, defendant's motion is GRANTED.

I.     BACKGROUND

The following facts are alleged in the complaint, and the Court assumes them to be true for purposes of this motion. ("Compl.", ECF No. 1.)

Puda Coal, Inc. ("Puda") is a U.S. company based in the People's Republic of China.[1] Prior to September 2009, Puda indirectly owned 90% of Shanxi Puda Coal Group Co., Ltd. ("Shanxi Coal"). (Id. ¶ 9.) The remaining 10% was split between Puda's Chairman and major shareholder Ming Zhao ("Zhao"), who owned 8%, and his brother Yao Zhao ("Y. Zhao"), who owned 2%. Y. Zhao was also the legal representative of Putai, Puda's indirect Chinese subsidiary. (Id.)

In September 2008, the Chinese government announced that, as part of its regulation of the coal industry, it would award certain large coal production enterprises the opportunity to acquire smaller coal mines. (Id. ¶ 77.) To participate in this lucrative opportunity, Shanxi and Puda would require additional financing. (Id. ¶ 78.)

In order to raise money from domestic investors to fund his expansion plans, Zhao needed to sever the direct foreign shareholder ownership (that is, the Delaware-incorporated Puda) of Shanxi. (Id. ¶ 146.) In September 2009, Zhao arranged for Y. Zhao to improperly transfer Puda's 90% share of Shanxi Coal to Zhao personally for no consideration. (Id. ¶¶ 6, 123, 146, 218.) Thereafter, Puda was a shell without any operations or revenues. (Id. ¶ 6, 218.)

On September 28, 2009, after Zhao had already transferred the 90% interest in Shanxi to himself, Puda announced that the Chinese government had selected Shanxi to become a consolidator of eight mines. (Id. ¶ 78.) Pursuant to that

---

[1] Puda is also a defendant in a related securities fraud action currently pending before this Court, In re Puda Coal Secs., Inc. Litig., 11 Civ. 2598 (KBF). Plaintiffs in that case are represented by the same counsel as plaintiffs here, who purport to sue derivatively on behalf of Puda.

program, Shanxi was required to consolidate operations, upgrade certain mines, and close other small mines; Shanxi required substantial financing to complete these directives. (Id. ¶¶ 79–80.)

Defendant CITIC Trust Co., Ltd. ("CITIC") is part of the CITIC Group Corporation, the largest private equity fund management company in China, and is wholly owned and controlled by the Chinese government. (Id. ¶¶ 12, 49.)

On or about July 15, 2010, Zhao transferred 49% of his shares in Shanxi to CITIC in exchange for 100% of the common stock in an investment fund created by CITIC, the "CITIC Fund I," which were worth $179 million. (Id. ¶ 12.)[2] CITIC had created the CITIC Fund I as an investment vehicle to hold and operate the business of Shanxi Coal. (Id. ¶ 13.) At about the same time, Zhao pledged his remaining 51% interest in Shanxi to CITIC as collateral for a $369 million loan to Zhao at an annual interest rate of 14.5%; CITIC increased the loan amount to nearly $740 million by January 2011. (Id. ¶ 14.) Zhao never disclosed to CITIC that he was not the beneficial owner of the shares that he was selling. (Id. ¶ 126 n.13.)[3]

At that point, CITIC controlled all of Shanxi Coal; CITIC's investment totaled $1.2 billion. (Id. ¶ 14.) CITIC recorded the share purchase, loan, and Zhao's pledge of 51% of his interest, and publicized these transactions to CITIC's prospective

---

[2] There were also other changes in ownership in the 49% in Shanxi preceding its transfer to CITIC Trust, which plaintiff states would have been "an alarming 'red flag'" to any "experienced private equity firm" like CITIC. (Id. ¶ 124.)

[3] Plaintiff argues that CITIC would not have entered into these transactions without conducting due diligence, and that the numerous changes in ownership of the shares would have "smacked of fraud." (Pl.'s Mem. of L. in Opp. to Def.'s Mot. to Dismiss 5–7, ECF No. 22 (citing Compl. ¶¶ 110–12, 120–24).) However, plaintiff does not allege that CITIC actually knew any of any fraud or changes in ownership.

Chinese investors.  (Id. ¶ 15.)  CITIC then offered shares to Chinese investors and sold $443 million of stock in China.  (Id. ¶ 18.)

Puda did not disclose the September 2009 transfer or the CITIC financing transactions to its U.S. shareholders.  (Id. ¶¶ 22, 40.)  Puda's 10-K filings in 2008, 2009, and 2010 each stated that its "operations are conducted exclusively by an entity in China, Shanxi Coal, which we control through 90% indirect equity ownership," and that the "operations of Shanxi Coal are our sole source of revenues." (Oberdier Decl. Ex. C, at 4, 12; Ex. D, at 4, 13; Ex. E, at 3, 17, ECF No. 18.)  In fact, Puda had no revenue and no profit in 2010 and materially less revenue and profit in 2009, because Zhao had transferred ownership of Shanxi away from Puda.  (Compl. ¶¶ 19, 130.)

Puda conducted two public offerings in the U.S. in February and December 2010; it misrepresented that it still owned a 90% interest in Shanxi, that it earned over $200 million in revenue and over $5 million in profit in 2009, and that it had earned more than $300 million in revenue and over $23 million in profit in 2010. (Id. ¶¶ 19, 20, 77, 130.)  In the December 2010 offering, Puda raised $108 million from U.S. investors based on SEC filings that falsely stated that Puda owned Shanxi, when in reality Zhao had transferred it to himself and then to CITIC.  (Id. ¶¶ 96–98.)

CITIC did not correct what are alleged to be Puda's misrepresentations.  (Id. ¶ 19.)  There are no factual allegations in the complaint that CITIC knew about those representations before or at the time at which they were made; indeed, all

4

were prior to CITIC's involvement.  Similarly, the complaint does not allege that CITIC reviewed, signed, or audited any of Puda's filings, or that CITIC had any role in or knowledge of the September 2009 transfer of Shanxi from Puda to Zhao; it was only after the transfer that Zhao began looking for Chinese investors.  (Id. ¶ 146.) The complaint also does not allege that CITIC owed Puda's shareholders any duty to investigate Puda's financial situation.  By the time of the CITIC financing transactions described below, Puda's former indirect ownership of Shanxi had been "sever[ed]" for ten months.  (Id.)

The complaint itself asserts that CITIC publicly disclosed its financing transactions with Zhao in its State Administration of Industry and Commerce ("SAIC") filings and in a July 2010 marketing report.  (Id. ¶ 15.)  In the marketing report, CITIC stated that the CITIC Fund I's primary purpose would be the acquisition of Shanxi's coal mines and coal washing plants and then the subsequent resale of those same assets back to Shanxi Coal.  (Id. ¶ 93.)  CITIC also stated that it intended to cooperate with Shanxi to take advantage of Puda's "strength in resources."  (Id. ¶ 97.)  In this report, CITIC disclosed its "100% equity control of Shanxi Coal" and stated that it would "supervise Shanxi Coal's daily operation very closely," as well as its expenditures.  (Id. ¶¶ 102–03, 105–06.)  CITIC also stated that it would "[p]otentially utilize Puda Group's two public listed companies' resources for capital operation."  (Id. ¶ 108.)

From July 2010 to August 2011, the 51% of Shanxi's shares that Zhao had pledged to CITIC changed hands several times.  (Id. ¶¶ 110–115.)  Among those

transfers was a December 2010 transfer in which Zhao secretly transferred back to Puda the 51% share in Shanxi. (Id. ¶¶ 111–14.) In August 2011, the 51% interest in Shanxi was transferred back to Zhao and pledged back to CITIC. (Id. ¶ 115.) Puda's Audit Committee Report found no "evidence that these asset transfer agreements have been filed in a government registry." (Id. ¶ 157.)

In April 2011, short-seller Alfred Little published a research report accusing Zhao of improperly transferring ownership of Shanxi to himself in September 2009 and selling and pledging his interest in Shanxi to CITIC, and stating that CITIC totally controlled Shanxi Coal. (Id. ¶ 23.) Puda's stock price on the U.S. stock markets promptly declined, and Puda's U.S. board of directors began an investigation. (Id. ¶¶ 24–25.)

On September 2, 2011, Puda's Audit Committee disclosed that its internal investigation confirmed that the rumors of Zhao's improper transfer of Puda's ownership of Shanxi to himself and the transfer to CITIC were correct. (Id. ¶ 29.) Zhao denied that any financing transaction between Shanxi and CITIC had occurred and provided a letter purporting to be from CITIC verifying this fact. (Id.) CITIC refused to cooperate with the investigation due to a confidentiality provision in its agreement with Shanxi Coal. (Id.) In a September 26, 2011 press release, Puda announced that the supposed CITIC letter was a forgery. (Id. ¶¶ 30–32.) The value of Puda's common stock dropped steadily over the period in question. (See id. ¶¶ 24–33.)

From April 14 to June 23, 2011, Puda shareholders brought eleven securities class actions on behalf of Puda investors against Puda's officers and directors as well as the underwriters of Puda's 2010 stock offering, alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b-5. (See ECF No. 38 at 1–2.) The Court consolidated those eleven lawsuits on December 6, 2011 (id. at 19–20), and plaintiff filed a consolidated complaint in that action on January 27, 2012 (ECF No. 45).

On April 8, 2013, plaintiff filed the complaint in this action, alleging, inter alia, a violation of section 20(a) of the Securities Exchange Act of 1934, aiding and abetting a breach of fiduciary duty, gross mismanagement, unjust enrichment, fraudulent concealment, conspiracy, and fraudulent conveyance. (Id. ¶¶ 166–227.)

II.    APPLICABLE LEGAL PRINCIPLES

    A. Personal Jurisdiction

"Where, as here, a district court relies on the pleadings and affidavits, and chooses not to conduct a full-blown evidentiary hearing, plaintiffs need only make a prima facie showing of personal jurisdiction over the defendant." Porina v. Marward Shipping Co., Ltd., 521 F.3d 122, 126 (2d Cir. 2008) (internal quotation marks omitted). The Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." Id. However, a court "will not draw argumentative inferences in the plaintiff's favor." In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 93 (2d Cir. 2008) (internal quotation marks omitted) ("In re Terrorist Attacks I"), abrogated on other grounds,

Samantar v. Yousuf, 560 U.S. 305 (2010).  A plaintiff may not rely on "conclusory statements . . . without any supporting facts," nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation."  Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 185 (2d Cir. 1998).

The personal jurisdiction inquiry comprises two steps.  First, the Court "look[s] to the law of the forum state to determine whether personal jurisdiction will lie."  Licci v. Lebanese Canadian Bank, 732 F.3d 161, 168 (2d Cir. 2013) (citing Best Van Lines, Inc. v. Walker, 490 F.3d 239, 242 (2d Cir. 2007)).  "If jurisdiction lies, we consider whether the district court's exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution."  Licci, 732 F.3d at 168 (citing Best Van Lines, 490 F.3d at 242; Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945)).

To determine whether exercise of jurisdiction over a foreign defendant comports with due process protections, the Court considers first whether "a defendant purposefully established minimum contacts within the forum State," and second "whether the assertion of personal jurisdiction would comport with fair play and substantial justice"—that is, whether it would be reasonable.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985).

B.  Motion to Dismiss Under Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). In applying that standard, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in plaintiff's favor, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." <u>Id.</u>

### C. Control Person Liability Under Section 20(a)

Section 20(a) of the Securities Exchange Act of 1934 provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 108 (2d Cir. 2007).

III.   DISCUSSION

A. Jurisdiction Over CITIC[4]

1. General Jurisdiction

CITIC has no presence in the United States and is not subject to the general jurisdiction of this Court. The Court's general jurisdiction "is based on the defendant's general business contacts with the forum state"; it requires that plaintiff demonstrates the defendant's "continuous and systematic general business contacts" with the forum. Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996) (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414–16 (1984)). Here, the complaint does not allege that CITIC has any presence in or systematic contacts with the United States. Accordingly, the Court lacks general jurisdiction over CITIC.

2. Long-Arm Jurisdiction and Due Process

Absent general jurisdiction, this Court engages in a two-pronged inquiry: is there long-arm jurisdiction, and does invocation of such jurisdiction comport with

---

[4] Defendant has not argued on this motion that it is immune under the Foreign Sovereign Immunities Act ("FSIA"), which "provides the sole basis for obtaining jurisdiction over a foreign sovereign in the United States." Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992). At oral argument on this motion, defense counsel indicated that it was not prepared to argue that CITIC, although it is wholly owned and controlled by the Chinese government, meets the definition of "agency or instrumentality of a foreign state" under the FSIA, 28 U.S.C. § 1603(a)–(b). (See Compl. ¶¶ 12, 49; Hr'g Tr. 7–9, Jan. 29, 2014.) However, assuming that the FSIA did apply, the analysis under the only potentially relevant exception would require inquiring whether defendant had performed "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere" that "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). For the same reasons as those outlined below, plaintiff would not meet the burden of showing that CITIC's actions in China vis-à-vis Shanxi had the type of "direct effect" needed to meet the commercial activity exception. As a result, if the Court analyzed personal jurisdiction under the FSIA, this action would have to be dismissed. However, personal jurisdiction over CITIC is also lacking under principles of jurisdiction applicable to non-sovereigns.

notions of due process? See Licci, 732 F.3d at 169. Due process requires that CITIC

have minimum contacts with the United States and that the exercise of jurisdiction

over it is reasonable. See Metro. Life Ins. Co., 84 F.3d at 567. Because the due-

process inquiry here is dispositive, the Court need not assess whether plaintiff has

alleged a prima facie case supporting jurisdiction under the New York long-arm

statute, N.Y. C.P.L.R. § 302(a). See Bensusan Restaurant Corp. v. King, 126 F.3d

25, 27 (2d Cir. 1997) (finding one of the two steps dispositive).

Where "the conduct that forms the basis for the controversy occurs entirely

out-of-forum, and the only relevant jurisdictional contacts with the forum are

therefore in-forum effects harmful to the plaintiff," the Second Circuit uses an

"effects test," by which "the exercise of personal jurisdiction may be constitutionally

permissible if the defendant expressly aimed its conduct at the forum." Licci, 732

F.3d at 173 (citing Calder v. Jones, 465 U.S. 783, 789 (1984)); see also Terrorist

Attacks I, 538 F.3d at 95 ("[T]he plaintiffs have the burden of showing that the

[defendants] engaged in 'intentional, and allegedly tortious, actions . . . expressly

aimed' at residents of the United States.") (quoting Calder, 465 U.S. at 789).[5] "[T]he

fact that harm in the forum is foreseeable . . . is insufficient for the purpose of

---

[5] The Second Circuit clarified in Licci that the "effects test" is the appropriate test in a case such as this, where "the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." 732 F.3d at 173. An alternative "purposeful availment" test—more favorable to plaintiff—applies "where the conduct on which the alleged personal jurisdiction is based occurs within the forum." Id. That test allows for jurisdiction to be established "even if the effects of the defendant's entire course of conduct are felt elsewhere." Id. at 173 (citing Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 172 (2d Cir. 2010); see also J. McIntyre Mach., Ltd. v. Nicastro, 131 S. Ct. 2780, 2787 (2011) (plurality opinion) (discussing the "purposeful availment" test). Nonetheless, the Court would reach the same result using that test; plaintiff has not shown that CITIC "purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002).

establishing specific personal jurisdiction over a defendant." In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 674 (2d Cir. 2013) ("Terrorist Attacks II").

Here, the complaint pleads nothing more than that CITIC, a company wholly owned and controlled by the Chinese government, purchased an equity interest in and extended secured financing to a Chinese company owned by Chinese nationals. (See Compl. ¶¶ 12, 14, 49.) Plaintiff alleges no conduct that CITIC "expressly aimed" at the United States. Calder, 465 U.S. at 789. Nor does the complaint allege that CITIC aided or furthered Puda's fraud in a manner that might have some effect in the United States; Puda's alleged fraud predated the CITIC financing transactions by ten months. (See Compl. ¶ 146.) Plaintiff also does not claim that CITIC's financing transactions, which occurred in China, required Zhao to divert Puda's funds to Shanxi.

Although mere knowledge would be insufficient for this Court to exercise jurisdiction over defendants, Plaintiff also fails to plead facts supporting a reasonable inference that CITIC knew that Zhao had fraudulently obtained his ownership of Shanxi or that Puda intended to misrepresent Shanxi's ownership to U.S. shareholders. Based on CITIC's size and asserted sophistication, plaintiff argues that CITIC could have or "would have" known of the fraud, due to certain "red flag" transactions that would have "smacked of fraud." (See, e.g., Compl. ¶¶ 123–24; Pl.'s Mem. of L. in Opp. to Def.'s Mot. to Dismiss ("Pl.'s Opp.") 7, ECF No. 22.) These assertions are conclusory and speculative, unsupported by any facts.

As an initial and dispositive matter, the complaint itself alleges that Zhao never disclosed to CITIC that he was not the beneficial owner of the shares that he was selling. (Compl. ¶ 126 n.13.) Without factual support, the complaint speculates that CITIC "knew," "expected," and "intended" that the proceeds from Puda's offerings would be used for Shanxi's "operations" and thus for CITIC's benefit, and alleges that Puda received $14.5 million of illicit proceeds from its offerings. (Compl. ¶¶ 18, 21, 97, 99, 108.)

The central, non-speculative allegation on which plaintiff's argument rests is a July 2010 marketing report to Chinese investors in which CITIC stated that it would "[p]otentially utilize Puda Group's two public listed companies' resources for capital operation." (Id. ¶ 108.) However, the complaint does not allege that CITIC in fact received any proceeds from the offerings; it does not allege that Zhao ultimately diverted any funds from Puda to Shanxi or that the financing transactions required him to do so. This simple ambiguous statement cannot support an assertion of knowledge regarding a multi-step fraud. The report simply does not allow for a plausible inference that CITIC was negligent or reckless with respect to Zhao's fraud, or that it in fact benefited from Puda's fraudulent offerings.

Even if the complaint were amended to allege that harm arising from Puda's fraud was foreseeable to CITIC, personal jurisdiction would still be lacking. Plaintiff concedes that intentional wrongdoing is required for jurisdiction over an out-of-forum defendant. (See Pl.'s Opp. 9 (citing Calder, 465 U.S. at 789–90).) Thus, to assert jurisdiction over CITIC, it must have engaged in an affirmative act

directed at (or into) the United States.  As the Second Circuit explained in Terrorist

Attacks:

> Even if the [defendants] were reckless in monitoring how their donations
> were spent, or could and did foresee that recipients of their donations would
> attack targets in the United States, that would be insufficient to ground the
> exercise of personal jurisdiction. . . . [Plaintiffs'] burden is not satisfied by the
> allegation that the [defendants] intended to fund al Qaeda through their
> donations to Muslim charities. Even assuming that the [defendants] were
> aware of Osama bin Laden's public announcements of jihad against the
> United States and al Qaeda's attacks on the African embassies and U.S.S.
> Cole, their contacts with the United States would remain far too attenuated
> to establish personal jurisdiction in American courts.

538 F.3d at 94–95; see also J. McIntyre Mach., Ltd. v. Nicastro, 131 S. Ct. 2780,

2789 (2011) ("[I]t is the defendant's actions, not his expectations, that empower

[the] courts to subject him to judgment."); Terrorist Attacks II, 714 F.3d at 674

("[T]he fact that harm in the forum is foreseeable . . . is insufficient for the purpose

of establishing specific personal jurisdiction over a defendant."); In re Satyam

Computer Servs. Ltd. Secs. Litig., 915 F. Supp. 2d 405, 457 (S.D.N.Y. 2012)

(dismissing a section 20(a) claim for lack of jurisdiction because, even if the

defendants had conspired with the principal wrongdoers in India, "[p]laintiffs

allege[d] no facts . . . which connect[ed] any of the . . . Defendants with transactions

occurring in the United States," but rather "assert[ed] only conclusorily that the . . .

Defendants 'had the ability to prevent the issuance of the false and misleading

statements or cause the statements to be corrected'").  Plaintiff alleges no such

affirmative act.

Plaintiff also argues that this Court has jurisdiction over this action based on

a derivative theory of liability.  In this regard, plaintiff asserts that CITIC allegedly

stole Puda's (a U.S. company's) assets indirectly by way of Puda's own transfer of funds to Zhao, and then Zhao's subsequent transfer to CITIC.  (See Pl.'s Opp. 12 ("CITIC's actions were a theft of Puda's money, in whose capacity Plaintiffs derivatively sue.").)

However, this derivative claim directly conflicts with plaintiff's section 20(a) claim: if Puda were the primary violator, then it would be barred from suing to recover such proceeds from CITIC as a party with which it allegedly conspired.  See In re Verisign, Inc., 531 F. Supp. 2d 1173, 1213 (N.D. Cal. 2007) ("[I]t is logically impossible for a corporation on whose behalf a derivative action is brought to also be a primary violator.").  Additionally, plaintiff would face an "impermissible conflict of interest" in representing a class of former shareholders while seeking to enforce the company's rights derivatively for the benefit of current shareholders and creditors. See Kamerman v. Steinberg, 113 F.R.D. 511, 516 (S.D.N.Y. 1986); Petersen v. Federated Dev. Co., 416 F. Supp. 466, 475 n.6 (S.D.N.Y. 1976) (citing cases).

Plaintiff also argues that this Court has jurisdiction over this action under a "control person" theory: CITIC had "100% equity control of Shanxi Coal" and "supervise[d] Shanxi Coal's daily operation very closely."  (Compl. ¶¶ 102, 103, 130.) However, no facts are alleged supporting a plausible inference that, once CITIC controlled Shanxi, it could have or did have control over a company (Puda) with which Shanxi no longer had any affiliation.  Control person "status alone [is] insufficient to warrant the conclusion that [defendant's] contacts with the United

States satisf[y] the requirements of due process." In re Parmalat Secs. Litig., 376 F. Supp. 2d 494, 454 (S.D.N.Y. 2005).

### 3. Jurisdiction Over Co-Conspirators

Finally, plaintiff argues that, "where a plaintiff has presented a sufficient showing that a conspiracy exists, personal jurisdiction may exist over a defendant based on acts that were committed by his [or her] co-conspirators." (Pl.'s Opp. 14 (quoting First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 218 F. Supp. 2d 369, 394 (S.D.N.Y. 2002) (alteration in original)).) The elements of conspiracy jurisdiction are that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant." Maersk, Inc. v. Neewra, Inc., 554 F. Supp. 2d 424, 442–43 (S.D.N.Y. 2008).

Plaintiff fails to plead a substantive prima facie claim of conspiracy. Rather, plaintiff conclusorily states that "Zhao and CITIC conspired to obtain $108 million from U.S. capital markets" and that this "theft" had an "impact" on Puda in the U.S. (Pl.'s Opp. 12, 15.) Plaintiff's allegation is conclusory and relies solely on the fact that following Zhao's transfer of Shanxi to CITIC, Puda subsequently raised $108 million. The complaint does not allege that CITIC had any knowledge of Zhao's fraud, that CITIC intended to collect on Puda's offerings, or that CITIC did anything to "have" Puda or Zhao allegedly transfer funds.

16

The <u>facts</u> that plaintiff alleges are equally consistent with CITIC's ignorance of Zhao's fraud; plaintiff does not allege that CITIC took an affirmative act directed toward this forum or that CITIC directed or controlled Puda's fraud, as required for a showing of conspiracy.  <u>See</u> <u>Twombly</u>, 550 U.S. at 566–68 (dismissing a conspiracy claim because plaintiffs showed only "parallel conduct" that was "not suggestive of conspiracy"); <u>Satyam</u>, 915 F. Supp. 2d at 485 (ruling that defendants' funneling stolen funds outside the United States did not create a "link" to the defendants in the United States); <u>Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.</u>, 761 F. Supp. 2d 103, 106–07 (S.D.N.Y. 2011) (ruling that the Court lacked jurisdiction in a section 20(a) case over two defendants who improperly gained revenue from selling shares outside the U.S.).

By contrast, the plaintiffs in <u>In re Sumitomo Copper Litig.</u>, 120 F. Supp. 2d 328, 340 (S.D.N.Y. 2000), demonstrated through letters and meetings that the defendant acted in New York for the benefit of two other defendants with their knowledge and consent and under their control.  Similarly, the plaintiffs in <u>Maersk</u>, 554 F. Supp. 2d at 444, provided the court with circumstantial and inferential evidence of a conspiracy, including phone calls and meetings involving a defendant who had lacked credibility.  CITIC's marketing report, which stated to investors that CITIC would "[p]otentially utilize Puda Group's two public listed companies' resources for capital operation" (Compl. ¶ 108), is insufficient to permit an inference of conspiracy to benefit from Zhao or Puda's fraud.

For these reasons, defendant's motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) is granted.

B. Jurisdictional Discovery

Plaintiff's request for jurisdictional discovery is denied. Jurisdictional discovery is warranted where, even if plaintiff has "not made a prima facie showing, [he has] made a sufficient start toward establishing personal jurisdiction." Stratagem Dev. Corp., 153 F.R.D. 535, 547–48 (S.D.N.Y. 1994); see also APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) ("[A] court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction . . . .") (internal quotation marks omitted). However, plaintiff here fails to illustrate how jurisdictional discovery would change his allegations or to "provide an outline of how [his] showing of minimum contacts might be enhanced by jurisdictional discovery." Satyam, 915 F. Supp. 2d at 485; see APWU, 343 F.3d at 627 (finding that "Plaintiffs fail to articulate" their need for jurisdictional discovery); Jazini, 148 F.3d at 186 ("Since [plaintiffs] did not establish a prima facie case that the district court had jurisdiction over [defendant], the district court did not err in denying discovery on that issue."). Accordingly, plaintiff's request is denied.

C. Failure to State a Claim

Plaintiff's claim under section 20(a) must also be dismissed because his allegations do not "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not

18

shown—that the pleader is entitled to relief." Iqbal, 556 U.S. at 679 (alterations and internal quotation marks omitted). Thus, the Court must disregard "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

Section 20(a) of the Securities Exchange Act provides that any person who "controls" a primary violator "shall also be liable . . . with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce" the primary violation. 15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, Inc., 493 F.3d at 108.

### 1. Control of the Primary Violator

Plaintiff fails to state a claim first because he fails to allege that CITIC exercised "control" over the primary violator, Puda. "Control" is "the power to direct or cause the direction of the management and policies of the primary violators, whether through the ownership of voting securities, by contract, or otherwise." In re Lehman Bros. Mortg.-Backed Secs. Litig., 650 F.3d 167, 185 (2d Cir. 2011) (alterations and internal quotation marks omitted). "Allegations of control . . . need not be pleaded with particularity." In re Parmalat Secs. Litig., 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006). Dismissal is inappropriate where "it is not implausible that

plaintiff could develop a record that could support a finding of control." In re Refco, Inc. Secs. Litig., 503 F. Supp. 2d 611, 640 (S.D.N.Y. 2007).

Plaintiff claims conclusorily that CITIC "controlled" Puda (Compl. ¶ 40), but CITIC had no relationship whatsoever with Puda: CITIC held none of Puda's shares, never participated in its management or affairs, and never participated in drafting or reviewing its filings. Rather, plaintiff alleges that (1) CITIC owned or controlled Zhao by virtue of his pledge of 51% equity interest in Shanxi; (2) Zhao controlled Puda; and (3) CITIC therefore controlled Puda indirectly "through Zhao." (Compl. ¶¶ 172–73.) However, CITIC did not own Puda's "voting securities" or have a "contract" with Zhao or Puda to raise funds through an offering. Lehman Bros., 650 F.3d at 185. Nor did CITIC or Zhao control a majority of the board, thus putting CITIC in a position to control Puda's offerings. Finally, CITIC was not involved in Puda's "day-to-day operations" and did not have "anything to do with the preparation or review of [Puda's] public statements." Food & Allied Serv. Trades Dep't, AFL-CIO v. Millfeld Trading Co., 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994), abrogated on other grounds, Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC, 223 F. Supp. 2d 474 (S.D.N.Y. 2002).

Plaintiff's theory of indirect liability, without actual control, cannot withstand a motion to dismiss. See Fezzani v. Bear, Stearns & Co., Inc., 384 F. Supp. 2d 618, 646 n.10 (S.D.N.Y. 2004) (Plaintiffs[] seek to hold [defendant] responsible based on tertiary liability—his control of Bear Stearns, which in turn allegedly controlled Baron. Plaintiffs[] cannot stretch the concept of control liability

so far."); see also Lehman Bros., 650 F.3d at 187 (ruling that "strategic direction . . .

falls far short of showing a power to direct the primary violators' management and

policies") (internal quotation marks omitted); In re Global Crossing, Ltd. Secs.

Litig., No. 02 Civ. 910 (GEL), 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005)

(explaining that the defendant must have actual control over the transaction in

question," and that "[c]onclusory allegations of control are insufficient as a matter of

law") (emphasis added).

At most, the allegations might indirectly support an inference that CITIC

exerted influence or indirect leverage over Zhao—only one member of Puda's

board—based on its power to foreclose on its loan to him.  However, even assuming

that CITIC wanted Puda to participate in securities fraud so that it could use

Puda's funds to benefit Shanxi and therefore itself, it lacked the influence to compel

that result.  In fact, even CITIC's economic influence over Puda itself would be

insufficient.  See, e.g., In re Alstom SA, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005)

("[E]xercise of influence, without power to direct or cause the direction of

management and policies through ownership of voting securities, by contract, or in

any other direct way, is not sufficient to establish control for purposes of Section

20(a)."); Gershon v. Wal-Mart Stores, Inc., 901 F. Supp. 128, 130 n.5 (S.D.N.Y. 2005)

("Mere economic power . . . over an issuer is clearly not sufficient to convert one into

a 'controlling person.'").[6]

---

[6] A plaintiff can also show actual control if defendant was "in a position to direct the acts of the
primary violator and could have prevented the issuance of the company's false statements."  In re
Flag Telecom Holdings, Ltd. Secs. Litig., 253 F. Supp. 2d 429, 457 (S.D.N.Y. 2005), abrogated on
other grounds, 574 F.3d 29 (2d Cir. 2009).  Plaintiff asserts that CITIC did not correct Puda's

Plaintiff's best argument is that, because (1) CITIC controlled Shanxi through its ownership of Shanxi shares, and because (2) Shanxi controlled Puda and Puda's actions in the United States, (3) CITIC similarly controlled Puda in the United States. Indeed, plaintiff alleges, <u>inter alia</u>, that CITIC had 100% control of Shanxi's equity; strictly controlled Shanxi's cash flow and expenditures; controlled Shanxi's ability to raise funds and conduct stock offerings; and installed a director on Shanxi's board. (<u>See</u> Pl.'s Opp. 19–20 (citing Compl. ¶¶ 95, 102–106, 109).) However, those allegations do not support plaintiff's claim that CITIC had actual, "day-to-day" control over <u>Puda</u>. (<u>See</u> Pl.'s Opp. 20 (citing <u>Refco</u>, 503 F. Supp. 2d at 660–63).) As set forth above, Shanxi and Puda were separate entities at the time of the CITIC financing transactions. By the time that CITIC owned Shanxi, Puda's former subsidiary, CITIC no longer exercised any control over any of Puda's assets or current subsidiaries at all.

For these reasons, plaintiff fails to allege that CITIC exercised control over Puda within the meaning of section 20(a).

### 2. Culpable Participation in the Fraud

Plaintiff also fails to establish any culpable participation by CITIC in Puda's fraud. "Some level of culpable participation at least approximating recklessness in the section 10(b) context must be alleged to state a section 20(a) claim." <u>Lapin v. Goldman Sachs Grp., Inc.</u>, 506 F. Supp. 2d 221, 248 (S.D.N.Y. 2006). That "scienter

---

misrepresentations in its offerings (Compl. ¶ 19); however, plaintiff has not alleged facts showing that CITIC maintained any control over Puda that would enable it to do so. Nor has plaintiff alleged that CITIC could have prevented Puda's fraud itself, which predated CITIC's involvement by ten months.

requirement can be satisfied by pleading either conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence—or actual intent." Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000) (internal quotation marks omitted). Moreover, culpable participation is subject to the heightened pleading requirement of the Private Securities Litigation Reform Act ("PSLRA"). See Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp., 874 F. Supp. 2d 341, 368 (S.D.N.Y. 2012).

"To qualify as 'strong' within the intendment of [the PSLRA], an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). Plaintiff here fails to plead facts creating a strong inference of CITIC's culpable participation in Puda's fraud. Rather, it is equally plausible—in fact, even more plausible—that CITIC was itself misled. The complaint states expressly that Zhao "failed to disclose to CITIC that he was not the beneficial owner of the shares he was selling." (Compl. ¶ 126 n.13.) Furthermore, once CITIC disclosed the financing transactions, Zhao forged a letter in an effort to discredit the transactions, thus demonstrating that the transactions were likely to expose the fraud rather than conceal it. (Compl. ¶¶ 15, 29, 30–32.) These facts belie any allegation that CITIC was aware of or conspired in Zhao's theft of Shanxi.[7]

---

[7] Plaintiff cites In re Blech Secs. Litig., No. 94 Civ. 7696 (RWS), 2002 WL 31356498, at *21 (S.D.N.Y. Oct. 17, 2002), for the proposition that "a controlling person's receipt of financial benefits can demonstrate culpable participation." In that case, however, the defendant admitted that it received substantial income from the transactions at issue. Id. Here, by contrast, as set forth above, the

Thus, plaintiff fails to allege facts supporting a theory of CITIC's culpable participation in Puda's fraud.  Defendant's motion to dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6) is granted.

IV.   CONCLUSION

For these reasons, defendant's motion to dismiss the complaint is GRANTED. The Clerk of Court shall close the motion at ECF No. 16 and terminate this action.

SO ORDERED.

Dated:   New York, New York
         March 11, 2014

                                   KATHERINE B. FORREST
                                   United States District Judge

---

complaint fails to allege that CITIC received financial benefits from Puda's misrepresentations with the heightened specificity required by Tellabs.